Phyllis RANIER, Individually and
as a Partner of Shadowlawn
Farm, Appellant,

v.

KIGER INSURANCE, INC. and Kiger
Enterprises, d/b/a Kiger Insurance
Group, Appellees.

and

Kiger Insurance, Inc., Cross-Appellant,

Phyllis Ranier, Individually and
as Partner of Shadowlawn
Farm, Cross-Appellee.

No. 1996–CA–002778–MR,
1996–CA–002855–MR

Court of Appeals of Kentucky.

July 23, 1999.

Tom H. Pierce, Amanda Foley Naish, Versailles, KY, Charles G. Wylie Lexington, KY, briefs for appellant/cross–appellee.

Linda Gosnell, Lexington, KY, briefs for appellees/cross–appellant.

Before: BUCKINGHAM, COMBS, and McANULTY, Judges.

## OPINION

BUCKINGHAM, Judge.

Phyllis Ranier (Phyllis) appeals and Kiger Insurance, Inc., and Kiger Enterprises d/b/a Kiger Insurance Group, successor to Kiger–Parks Insurance Group (hereinafter collectively referred to as Kiger) cross-appeal from a judgment of the Fayette Circuit Court on Kiger's claim against Phyllis for money damages for insurance premiums allegedly owed by her. We affirm in part, reverse in part, and remand.

Phyllis and her son, Harry Ranier (Harry), operated a horse farm as a general partnership under the assumed name of Shadowlawn Farm. A certificate of assumed name was filed to that effect with the Kentucky Secretary of State in November 1981. In July 1985, the Raniers filed a statement of withdrawal of an assumed name with the secretary of state, as Phyllis had transferred all of her interest in the partnership to Harry.[1] Shortly thereafter, Harry filed articles of incorporation of Shadowlawn Farm, Inc., with the secretary of state. Phyllis had no ownership interest in the corporation.

In 1984, prior to the dissolution of the partnership, Harry purchased mortality insurance on the partnership's horses from Kiger. This policy was renewed in 1985, but subsequently lapsed. Harry purchased another policy from Kiger in 1987 which was renewed on its expiration. In 1989, the corporation's horses were repossessed, after which Harry cancelled all of his insurance coverage with Kiger. Prior to that cancellation, however, Kiger continued to provide policies for Harry despite the fact that unpaid premiums existed in his account.

In 1991, Kiger filed suit against Harry and Phyllis to recover its unpaid premiums. The trial court found that the partnership ceased to exist in July 1985, meaning that Harry and Phyllis were liable for insurance premiums owed to Kiger which were incurred prior to that date. The trial court further found Harry to be solely responsible for any premiums owed to Kiger which were incurred after the partnership's dissolution. A judgment was entered, and both Phyllis and Kiger appealed.

In 1994, this court rendered an opinion holding that the trial court had correctly found that the partnership had been dissolved in July 1985 and that Harry and Phyllis were jointly liable for partnership debts which were incurred prior to that date. It is uncontested that the partnership's debt to Kiger at the time of dissolution was $45,688.86. However, noting that Kiger had maintained Shadowlawn's account as an open ledger account and that separate accounts were not created for each policy, this court agreed with Phyllis that payments on the account subsequent to the partnership dissolution could be credited to the partnership debt. Citing *City of Louisa v. Horton*, 263 Ky. 739, 93 S.W.2d 620 (1935), this court stated that "[i]n the absence of an application by either the debtor or the creditor, 'the court will make the application to the payment of the more [sic] precarious or the older, if both are due.'" This court then remanded the case to the trial court to determine if payments made on Shadowlawn's account "after the date of dissolution exceeded the amount owed by the partnership on the date of dissolution."

This court further found that the Raniers had failed to give Kiger appropriate notice of the dissolution of the partnership, meaning that Phyllis was also bound by the actions taken by Harry after she with-

---

1. This withdrawal of an assumed name form provides that the general partnership of R & R Enterprises is being withdrawn; however, this court previously approved the trial court's finding that the Shadowlawn Farm partnership ceased to exist on the date of the filing of the withdrawal of the assumed name form.

drew from the partnership. Thus, this court reversed the trial court's determination that Phyllis was not liable for post-dissolution debts owed to Kiger.[2] However, this court ordered the trial court to make a finding as to whether Phyllis's liability for post-dissolution debts owed to Kiger was limited to partnership assets by virtue of Kentucky Revised Statute (KRS) 362.320.

In March 1996, the trial court issued a lengthy order on remand. It found that Phyllis should not be entitled to credit for post-dissolution payments made to Kiger by Harry as "it is plainly unfair for Phyllis to escape payment of her just partnership debts by applying monies paid by Harry Ranier individually, and after the date of dissolution of the partnership." The trial court's order does not contain an explicit finding as to whether the amount of post-dissolution payments made to Kiger by Harry exceeded the partnership's debt to Kiger at the time of dissolution, although the trial court was directed to do so by this court's opinion. The trial court further held that, although Phyllis was liable for post-dissolution debts, her obligation for those debts was limited to partnership assets by virtue of KRS 362.320.

Phyllis filed a motion to alter, amend or vacate the trial court's March 1996 order pursuant to Kentucky Rule of Civil Procedure (CR) 59. In its order denying Phyllis's motion, the trial court stated that it alone had the responsibility to make findings of fact concerning whether post-dissolution payments made by Harry should be credited to the partnership's Kiger debts or to the corporation's Kiger debts. The trial court further stated that "[t]he Court

of Appeals should not expect this Court to follow its findings of fact whether erroneous or not." Citing *Anspacher v. Utterback's Adm'r*, 252 Ky. 666, 68 S.W.2d 15 (1934), the trial court determined that its refusal to credit post-dissolution payments to Phyllis was within its discretion.

Phyllis then filed the direct appeal sub judice in which she asserts that she was entitled to credit for the post-dissolution payments. Kiger filed the cross-appeal sub judice in which it argues that the trial court erroneously found that Phyllis's liability for post-dissolution debts was limited to partnership funds.

## DIRECT APPEAL

■ Phyllis's direct appeal concerns whether she is liable for the partnership debt to Kiger or whether she should receive credit for payments made by Harry after the dissolution of the partnership. It is uncontested that the partnership debt to Kiger at the time of dissolution was $45,688.86 and that over $48,000 in cash was transferred from the partnership's checking account to the corporation upon the dissolution of the partnership. Furthermore, it is uncontested that the post-dissolution payments made to Kiger were in excess of $64,000.[3]

In the first appeal, this court relied primarily upon the "doctrine of applied payments" as set forth in *Anspacher, supra,* which provides in relevant part as follows:

> It is the generally accepted rule that, where neither the debtor nor the creditor has applied the payment to either one of two debts, owing by the first to the latter, and it becomes necessary for a court of justice to direct on what debt

2. The post-dissolution debts owed by Shadowlawn to Kiger amounted to approximately $117,000.

3. In this court's first opinion, we instructed the trial court "to determine from the evidence whether the credits received and applied to the account after the date of dissolution exceeded the amount owed by the partnership on the date of dissolution." Although the trial court failed to make this de-

termination and enter a finding, it appears uncontested that the post-dissolution payments were in excess of $64,000. In fact, in pleadings filed before the trial court, Kiger stated that it "agrees that the payments received and applied to the account after the date of dissolution exceed the amount owed by the partnership on the date of dissolution.... "

the payment shall be applied ..., the court will make the application to the payment of the most precarious or the oldest, if both debts be due.... As a criterion when applying the doctrine of "applied payments," the court should exercise a sound discretion, according to its notions of justice on equitable principles, so as to effectuate justice, according to the extrinsic equity of the case. *Id.* 252 Ky. at 678. After citing *Anspacher*, this court rejected Kiger's argument that it applied the payments in question to policies currently in effect rather than past-due premiums on expired policies and held that "Kiger's bookmaking procedures indicate that the opposite was done." This court then directed the trial court to determine whether the payments made on the account after the partnership dissolution exceeded the partnership debt at the time of dissolution.

On remand, the trial court recognized the applicability of *Anspacher*; however, it focused on the language in *Anspacher* which allows courts to use their discretion to "effectuate justice, according to the extrinsic equity of the case." *Anspacher*, *supra* 252 Ky. at 678. The trial court opined that it would be unfair to allow Phyllis to obtain a credit for post-dissolution payments made by Harry and also opined that Kiger had construed the payments in question to be made on current policies.

■ The law of the case doctrine essentially holds that a final decision of an appellate court is determinative of an issue, whether that decision is right or wrong, and a lower court is bound by the higher court's decision. *See e.g., Williamson v. Commonwealth,* Ky., 767 S.W.2d 323, 325 (1989); *Taylor v. Mills,* Ky., 320 S.W.2d 111, 112 (1958). On remand, the trial

court specifically held that the payments made by Harry to Kiger subsequent to the partnership dissolution should not be credited to the partnership debts. The trial court further maintained that *Anspacher* gave it discretion in determining whether to credit the subsequent payments to the partnership debts and held that to do so "would be indeed to punish Kiger for the good deed of exercising sound business discretion in an attempt to help Harry Ranier stay afloat in the horse industry." While we understand the trial court's position, we conclude that the first opinion of this court directed that the subsequent payments be credited to the partnership debts and that that opinion is now the law of the case. In short, we reverse and remand with instructions to the trial court to enter a judgment which reflects a credit to Phyllis for post-dissolution payments made on the account.

## CROSS–APPEAL

Kiger's cross-appeal relates to the trial court's determination that Phyllis has no liability to Kiger for post-dissolution debts. In the first appeal, this court found that Harry's actions bound Phyllis for post-dissolution debts owed to Kiger by virtue of KRS 362.320(1)[4] due to the Raniers' failure to give Kiger actual notice of the dissolution of the partnership as envisioned by KRS 362.160(2). This court then remanded the case to the trial court and ordered it to determine whether Phyllis's status as a partner in Shadowlawn was known to Kiger when it extended credit to Harry prior to the dissolution of the partnership. This court further held that if the trial court found that Phyllis's status as a partner was unknown to Kiger and that she was so inactive in partnership

---

4. KRS 362.320(1) provides in relevant part that:
   (1) After dissolution a partner can bind the partnership ...:
   ....
   (b) By any transaction which would bind the partnership if dissolution had not taken

place, provided the other party to the transaction:
   (I) Had extended credit to the partnership prior to dissolution and had no knowledge or notice of the dissolution....

affairs that the partnership's business reputation was not due to her connection with it, "her liability to Kiger shall be satisfied solely out of partnership assets. Otherwise she is liable *for the entire debt owed Kiger." See* KRS 362.320(2).[5]

■ The trial court specifically found that Phyllis met the requirements of KRS 362.320(2)(a) in that "[t]he evidence is undisputed that Kiger did not know that Phyllis Ranier was a partner as such with Harry Ranier when it extended credit on Shadowlawn Farm's account." It is undisputed that Kiger representatives testified they were unaware of Phyllis's partnership status when they were extending credit to the partnership, but Kiger argues that it had constructive notice of her status by virtue of the filing of the certificate of assumed name. KRS 362.320(2) makes no mention of constructive notice being sufficient to constitute knowledge, and Kiger cites no authority to support its position. The trial court's finding that Kiger had no knowledge of Phyllis's status as a partner is not clearly erroneous and will not be set aside. CR 52.01.

■ The other question to be resolved is whether Phyllis can meet the requirements of KRS 362.320(2)(b). Kiger argues that the testimony at trial was that Phyllis's status as a partner in Shadowlawn Farm was "common knowledge." There was evidence, however, that Phyllis was an inactive partner in Shadowlawn Farm. The trial court held that "[t]he evidence taken as a whole indicates that Phyllis Ranier was so far unknown and inactive in partnership affairs that the business reputation of the partnership could not be said to have been in any degree due to her connection with it." We determine that the trial court's finding in this regard was not clearly erroneous and should not be set aside. CR 52.01.

The judgment of the Fayette Circuit Court is affirmed in part and is reversed in part and remanded for further proceedings consistent with this opinion.

ALL CONCUR.

■

---

5. KRS 362.320(2) states that
[t]he liability of a partner under paragraph (b) of subsection (1) shall be satisfied out of partnership assets alone when such partner had been prior to dissolution:
(a) Unknown as a partner to the person with whom the contract is made; and

(b) So far unknown and inactive in partnership affairs that the business reputation of the partnership could not be said to have been in any degree due to his connection with it.